**ORAL ARGUMENT HAS NOT BEEN SCHEDULED**

**Case No. 22-1205**

UNITED STATES COURT OF APPEALS

FOR THE DISTRICT OF COLUMBIA CIRCUIT

CITY OF LINCOLN, D/B/A LINCOLN ELECTRIC SYSTEM

*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION

*Respondent.*

--------------------

Petition for Review of Orders of the Federal Energy Regulatory Commission

--------------------

**FINAL INITIAL BRIEF FOR PETITIONER**

**CITY OF LINCOLN, D/B/A LINCOLN ELECTRIC SYSTEM**

--------------------

Debra D. Roby
Alan I. Robbins
Thomas B. Steiger III
Washington Energy Law LLP
900 17th Street NW, Suite 500A
Washington, DC 20006
droby@washingtonenergylaw.com
202.326.9313

*Attorneys for Lincoln Electric System*

Final Initial Brief: July 26, 2023

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Petitioner provides the following information in compliance with Rule 28(a)(1) of the Federal Rules of Appellate Procedure and Circuit Rule 28(a)(1):

**A.      Parties and Amici:**

1. The following is a list of all parties, intervenors, and *amici* who appeared before the Federal Energy Regulatory Commission ("FERC" or the "Commission") in the underlying proceedings:

> Basin Electric Power Cooperative
>
> Corn Belt Electric Cooperative, Inc.
>
> East River Electric Power Cooperative, Inc.
>
> Federal Energy Regulatory Commission
>
> Lincoln Electric System
>
> Missouri River Energy Services
>
> Municipal Energy Agency of Nebraska
>
> North Iowa Municipal Electric Cooperative Association
>
> Northwest Iowa Power Cooperative
>
> NorthWestern Corporation
>
> Southwest Power Pool Power Pool, Inc.
>
> Western Area Power Administration

2. The following is a list of all parties, intervenors, and *amici* who have petitioned this Court or intervened in this proceeding:

Petitioner
Lincoln Electric System

Intervenor in Support of Petitioner
Southwest Power Pool, Inc.

Respondent
Federal Energy Regulatory Commission

Intervenors in Support of Respondent
Basin Electric Power Cooperative
Western Area Power Administration

**B.    Rulings Under Review**

1. *Southwest Power Pool, Inc.*, Order Rejecting Tariff Revisions, Docket Nos. ER22-411-000 and ER22-411-001, 179 FERC ¶ 61,045 (April 15, 2022)("April 15 Order");

2. *Southwest Power Pool, Inc.*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, Docket No. ER22-411-002, 179 FERC ¶ 62,147 (June 16, 2022)("Notice of Denial by Operation of Law"); and,

3. *Southwest Power Pool, Inc.*, Order Addressing Arguments Raised on Rehearing, Docket No. ER22-411-002, 180 FERC ¶ 61,211 (September 29, 2022)("September 29 Order").

**C.    Related Cases**

This case has not previously been before this Court or any other court. To counsel's knowledge, there are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

/s/  Debra D. Roby
Debra D. Roby

ii

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure Rule 26.1 and Circuit Rule 26.1, City of Lincoln, d/b/a Lincoln Electric System ("Lincoln Electric") states that it is a municipal electric utility formed in 1966 pursuant to Lincoln municipal law. LINCOLN, NEB., MUN. CODE Chapter 4.24 (2022). Lincoln Electric is locally-owned and governed. It is a not-for-profit entity, meaning it does not have a parent corporation and does not issue stock. Accordingly, Lincoln Electric is not subject to the Disclosure Statement required by Federal Rule of Appellate Procedure Rule 26.1 and Circuit Rule 26.1.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ....... i

CORPORATE DISCLOSURE STATEMENT.................................................. iii

GLOSSARY ........................................................................................................ ix

STATEMENT OF JURISDICTION.................................................................1

STATEMENT OF THE ISSUES.......................................................................2

STATUTES AND REGULATIONS ................................................................2

STATEMENT OF THE CASE.........................................................................2

    A. The Southwest Power Pool's Transmission Pricing Zones.........................2

    B. The Upper Missouri Zone (Zone 19)....................................................5

    C. The Laramie River Transmission Facilities...........................................6

    D. Lincoln Electric's Proposed Tariff Modifications. ...................................7

    E. FERC's Orders Rejecting Lincoln Electric's Recovery of its Investment
       in Zone 19 Facilities. .........................................................................10

SUMMARY OF ARGUMENT .......................................................................12

STANDING.......................................................................................................14

ARGUMENT .....................................................................................................15

    I.   STANDARD OF REVIEW ...........................................................15

    II. THE COMMISSION'S ORDERS IMPROPERLY DEPART FROM
        PRECEDENT THAT PROVIDES FOR RECOVERY OF A
        TRANSMISSION OWNER'S REVENUE REQUIREMENT FROM
        THE TRANSMISSION PRICING ZONE IN WHICH THE
        TRANSMISSION FACILITIES ARE LOCATED...................................16

        A. The Commission's Evaluation of Lincoln Electric's Proposal for
           Purposes of "Placing" Lincoln Electric's Ownership Interest in Jointly-
           Owned Facilities that are Already Part of the Southwest Power Pool
           Transmission System is Arbitrary and Capricious, Not Supported by
           the Record and Not the Result of Reasoned Decision-making...............16

        B. The Commission's Finding that Lincoln Electric's Share of the
           Laramie River Facilities Are Legacy Facilities that are Dedicated to
           Serving Only Lincoln Electric's Load, and that Do Not Serve Zone 19

**Load, is Unsupported by and Contrary to Substantial Record Evidence**...................................................................................**25**

1. **The Laramie River Transmission Facilities cannot reasonably be accepted as networked "backbone" facilities for purposes of placing the Laramie Transmission Facilities in Zone 19 but not for the purposes of Lincoln Electric's recovery of its investment in those same facilities from Zone 19**........................................**25**

2. **FERC's finding that Lincoln Electric's ownership share in the Laramie River Facilities was and remains dedicated to serve Lincoln Electric's load is contrary to the record evidence.**...............................**29**

3. **The Commission's reliance on the fact that Lincoln Electric serves no load in Zone 19 is contrary to precedent and is not the result of reasoned decision-making**.............................................................**32**

4. **Recovery based on the physical location of the facilities is neither inherently unjust and unreasonable nor dependent on an express tariff provision requiring such placement.**..........................................**36**

5. **The Commission's reliance on the fact that Lincoln Electric does not serve load in Zone 19 is contrary to its policy that there is no such requirement**..................................................................................**39**

C. **The Commission's Conclusory Finding that Lincoln Electric's Proposal is Inconsistent with the Cost Causation Principles is Arbitrary and Capricious.** .............................................................................**40**

**CONCLUSION**....................................................................................**43**

# TABLE OF AUTHORITIES

## Court Cases

*Am. Gas Ass'n v. FERC,*
   593 F.3d 14 (D.C. Cir. 2010)...................................................................15

*Cal. Pub. Utils. Comm'n v. FERC,*
   20 F.4th 795 (D.C. Cir. 2021)................................................................15

*Del. Div. of the Pub. Advoc. v. FERC,*
   3 F.4th 461 (D.C. Cir. 2021)...................................................................16

*Hoopa Valley Tribe v. FERC,*
   913 F.3d 1099 (D.C. Cir. 2019)..............................................................15

*In re NTE Conn., LLC,*
   26 F.4th 980 (D.C. Cir. 2022)................................................................43

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983).................................................................................15

*Neb. Pub. Power Dist. v. FERC*,
   957 F.3d 932 (8th Cir. 2020) .............................................................2, 21

*\*PPL Wallingford Energy LLC v. FERC,*
   419 F.3d 1194 (D.C. Cir. 2005)............................................... 14, 19, 43

*TransCanada Power Mktg. Ltd. v. FERC,*
   811 F.3d 1 (D.C. Cir. 2015)....................................................................43

*W. Deptford Energy, LLC v. FERC,*
   766 F.3d 10 (D.C. Cir. 2014)........................................................ 16, 43

**Administrative Cases**

*Midcontinent Indep. Sys. Operator, Inc.*,
  164 FERC ¶ 61,194 (2018) ........................................................... 37, 38

*PJM Interconnection, L.L.C.*,
  94 FERC ¶ 61,295 (2001) .............................................................. 33, 39

*PJM Interconnection, L.L.C.*,
  95 FERC ¶ 61,217 (2001) ........................................................ 33, 34, 39

*PJM Interconnection, L.L.C.*,
  119 FERC ¶ 61,063 (2007) ..................................................................41

*Sw. Power Pool, Inc.*,
  179 FERC ¶ 62,147 (2022) .............................................................. ii, 1

*Sw. Power Pool, Inc.*,
  112 FERC ¶ 61,355 (2005) ....................................................................3

*Sw. Power Pool, Inc.*,
  106 FERC ¶ 61,110 (2004) ....................................................................3

*Sw. Power Pool, Inc.*,
  108 FERC ¶ 61,003 (2004) ....................................................................3

*Sw. Power Pool, Inc.*,
  114 FERC ¶ 61,242 (2006) ....................................................................3

*Sw. Power Pool, Inc.*,
  120 FERC ¶ 61,297 (2007) ................................................................. 35

*Sw. Power Pool, Inc.*,
  125 FERC ¶ 61,239 (2008) ....................................................................7

*Sw. Power Pool, Inc.*,
  149 FERC ¶ 61,113 (2014) ..................................................... 5, 6, 27

*Sw. Power Pool, Inc.*,
  153 FERC ¶ 61,051 (2015) ...................................................................6

*Sw. Power Pool, Inc.*,
  155 FERC ¶ 61,316 (2016) ...................................................................6

*Sw. Power Pool, Inc.,*
  179 FERC ¶ 61,045 (2022)... ii, 1, 4, 10, 11, 12, 16, 17, 19, 21, 25, 30, 34, 35, 36,
  ............................................................................... 37, 39, 40, 41

*Sw. Power Pool, Inc.*,
  110 FERC ¶ 61,138 (2005) ...................................................................3

*Sw. Power Pool, Inc.*,
  180 FERC ¶ 61,211 (2022) ................ii, 2, 6, 11, 12, 17, 19, 29, 31, 35, 37, 38, 41

**Administrative Procedure Act**

APA, 5 U.S.C. § 706 ...........................................................................15

**Federal Power Act**

FPA § 205, 16 U.S.C. § 824d ...............................................................7

FPA § 313(b), 16 U.S.C. § 825*l*(b) ........................................................1

**Rulemaking Order**

*Promoting Wholesale Competition Through Open Access Non-Discriminatory
  Transmission Services by Public Utilities; Recovery of Stranded Costs by Public
  Utilities and Transmitting Utilities*, Order No. 888,
  FERC Stats. & Regs. ¶ 31,036 (1996) ..................................................20

*\* Authorities upon which Petitioner chiefly relies are marked with asterisks.*

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| Allegheny | Allegheny Electric Cooperative |
| Basin Electric | Basin Electric Power Cooperative |
| Basin Protest | Motion to Intervene and Protest of Basin Electric Power Cooperative, Basin Electric Power Cooperative, Docket No. ER22-411-000 (filed December 7, 2021). |
| Commission or FERC | Federal Energy Regulatory Commission, the Respondent in this case. |
| Deficiency Response | Response to Deficiency Letter, Lincoln Electric System, Docket No. ER22-411-000 (filed February 14, 2022). |
| FERC's Orders | *Southwest Power Pool, Inc.*, 179 FERC ¶ 61,045 (April 15, 2022)(April 15 Order); and *Southwest Power Pool, Inc.*, 180 FERC ¶ 61,211 (September 29, 2022)(September 29 Order). |
| FPA | Federal Power Act |
| Lincoln Electric | Lincoln Electric System |
| Lincoln Electric Dec. 21 Answer | Lincoln Electric System's Motion for Leave to Answer and Answer, Lincoln Electric System, Docket No. ER22-411-000 (filed December 21, 2021). |
| Lincoln Electric Mar. 22 Answer | Lincoln Electric System's Motion for Leave to Answer and Answer, Lincoln Electric System, Docket No. ER22-411-000 (filed March 22, 2022). |
| Lincoln Electric Request for Rehearing | Request for Rehearing of Lincoln Electric System, Lincoln Electric System, Docket Nos. ER22-411-000 and ER22-411-001 (filed May 16, 2022). |

| Lincoln Electric Transmittal Letter | Revisions to Formula Rate Template, Lincoln Electric System Transmittal Letter, Docket No. ER22-411-000 (filed November 15, 2021). |
|---|---|
| Midcontinent System | Midcontinent Independent System Operator, Inc. |
| Opinion No. 494 | *PJM Interconnection, L.L.C.*, 119 FERC ¶ 61,063 (2007)("Opinion No. 494"). |
| PJM Interconnection | PJM Interconnection, L.L.C. |
| PPL Group Zone | PPL Electric Utilities Corporation (PPL) and UGI Utilities, Inc. (UGI) are the transmission owners within the PPL Group Zone |
| Southwest Power Pool Answer | Motion for Leave to Answer and Answer of Southwest Power Pool, Inc., Southwest Power Pool, Inc., Docket No. ER22-411-000 (filed December 21, 2021). |
| Southwest Power Pool Transmittal Letter | Revisions to Tariff, Bylaws, and Membership Agreement, Southwest Power Pool Transmittal Letter, Docket No. ER14-2850 (filed Sept. 11, 2014). |
| Tariff | Open Access Transmission Tariff |
| Westar | Westar Energy Inc. |
| Zone 16 | The Lincoln Electric Zone |
| Zone 17 | The Nebraska Public Power District Zone |
| Zone 19 | Upper Missouri Zone |

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

### No.  22-1205
_____

CITY OF LINCOLN, D/B/A LINCOLN ELECTRIC SYSTEM
*Petitioner*,
v.
FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.
_____

On Petition for Review of the Orders of the
Federal Energy Regulatory Commission
_____

### FINAL BRIEF OF PETITIONER
### LINCOLN ELECTRIC SYSTEM

---

### STATEMENT OF JURISDICTION

This Court has jurisdiction under Federal Power Act ("FPA") Section 313(b),

16 U.S.C. § 825*l*(b). The Commission issued its initial order on April 15, 2022. *Sw.*

*Power Pool, Inc.*, 179 FERC ¶ 61,045 (2022) ("April 15 Order"), JA0656-JA0674.

Petitioner sought timely rehearing on May 16, 2022. JA0675-JA0706. On June 16,

2022, FERC issued a Notice stating that the rehearing request was deemed to be

denied by operation of law. *Sw. Power Pool, Inc.*, 179 FERC ¶ 62,147 (2022),

JA0707-JA0708. On August 12, 2022, Lincoln Electric submitted a timely petition

for review. On September 29, 2022, FERC issued a further order addressing the

arguments raised on rehearing, modifying its discussion of the April 15 Order but reaching the same result. *Sw. Power Pool, Inc.*, 180 FERC ¶ 61,211 (2022) ("September 29 Order"), JA0709-JA0729. Lincoln Electric filed an amended petition for review on November 22, 2022.

## STATEMENT OF THE ISSUES

Whether the Federal Energy Regulatory Commission's decision to not allow Lincoln Electric to allocate a portion of its revenue requirement to the transmission pricing zone in which the transmission facilities are located is contrary to established Commission precedent, unsupported by and contrary to the record evidence, and not the result of reasoned decision-making.

## STATUTES AND REGULATIONS

The relevant statutory provisions are reproduced in the Statutory Addendum attached hereto in Appendix A.

## STATEMENT OF THE CASE

### A. The Southwest Power Pool's Transmission Pricing Zones.

Southwest Power Pool is a regional transmission organization established in 2004 to provide electric transmission services across a multi-state region using the transmission facilities of 15 different utilities placed in 15 different zones. *Neb. Pub. Power Dist. v. FERC*, 957 F.3d 932, 935 (8th Cir. 2020). Under its license-plate (or zonal) rate design, transmission customers located in each pricing zone pay, among

other charges, rates based on the cost of the transmission facilities located in the zone in which the customer's load is located. *Id.*

When Southwest Power Pool first sought recognition as a regional transmission organization, FERC found that its open access transmission tariff ("Tariff") failed to provide for multiple transmission owners' facilities to be included in a single transmission pricing zone. *Sw. Power Pool, Inc.*, 106 FERC ¶ 61,110, P 115 (2004); *see also Sw. Power Pool, Inc.*, 108 FERC ¶ 61,003, P 78, n.62 (2004), *reh'g granted in part*, 110 FERC ¶ 61,138 (2005). Recognizing that this presented a barrier for additional transmission owners to join the regional transmission organization, FERC directed Southwest Power Pool to revise its Tariff to accommodate additional transmission owners in a single pricing zone and to provide appropriate compensation for their transmission facilities. *Sw. Power Pool, Inc.*, 112 FERC ¶ 61,355 (2005), *clarified and reh'g denied*, 114 FERC ¶ 61,242 (2006). Following the Commission's directive, Southwest Power Pool developed amendments to Attachments AI (defining what facilities qualify as transmission) and L (distribution of regional transmission organization revenues among Transmission Owners) to "provide for the distribution of revenue between multiple entities owning transmission facilities in a single zone." *Sw. Power Pool, Inc.*, 112 FERC ¶ 61,355, P 43 (2005).

3

In a zone with multiple transmission owners, the zonal rate is based on the sum of the revenue requirements of the owners of the transmission facilities located in the zone. Southwest Power Pool Tariff, Attachment L, § II.B.2; *see also* April 15 Order P 2, JA0656-JA0657. Consequently, transmission customers or load in that zone pay a rate that reflects the costs of all the transmission facilities located in the zone. Southwest Power Pool Tariff, Attachment L, § II.B.2. When a new transmission owner is added to an existing pricing zone, its revenue requirement for transmission facilities located in the zone and any associated load not already included in the zonal load are added to the existing zone's totals. *Id.*

To be eligible to recover a revenue requirement under the regional transmission organization's tariff, the transmission owner must transfer functional control of its facilities to the regional transmission organization. This involves transferring significant responsibility and functions, including being prepared to follow the regional transmission organization's directives regarding the day-to-day operation and ongoing maintenance of the transferred facilities. The Southwest Power Pool Membership Agreement provides, for example, that transferring functional control vests Southwest Power Pool with the authority to direct the day-to-day operations of the facilities in order to carry out its responsibilities as a transmission provider and reliability coordinator. Southwest Power Pool Membership Agreement, § 2.1.1(k). The Southwest Power Pool Membership

4

Agreement also requires, for example, that the transmission owner comply with the regional transmission organization's instructions in carrying out its role as reliability coordinator, Southwest Power Pool Membership Agreement, § 2.1.1(k), and to coordinate and obtain the regional transmission organization's approval for maintenance on the transmission facilities, Southwest Power Pool Membership Agreement, § 2.1.3, among other duties. For jointly-owned facilities, this necessarily means that transferring control to the regional transmission organization cannot be effectuated unless and until the co-owner responsible for maintaining and operating the transmission facilities agrees to the transfer.

### B.    The Upper Missouri Zone (Zone 19).

In 2015, Southwest Power Pool expanded its geographic reach significantly, adding facilities owned and operated by the Western Area Power Administration, Basin Electric Power Cooperative ("Basin Electric"), and Heartland Consumers Power District, whose combined facilities comprise the "Integrated System." *Sw. Power Pool, Inc.*, 149 FERC ¶ 61,113 (2014). This expansion added more than 9,500 miles of transmission infrastructure, and established Zone 19 of Southwest Power Pool's system, also known as the "Upper Missouri Zone." *Id.* Included among the facilities that make up the Integrated System, and of relevance to this proceeding, are the Laramie River Facilities. The transfer of the Integrated System to Southwest Power Pool, including the Laramie River Facilities, was effective as of October 1,

2015. *Sw. Power Pool Inc.,* 149 FERC ¶ 61,113 (2014), *order on reh'g*, 153 FERC

¶ 61,051 (2015), *order on uncontested partial settlement,* 155 FERC ¶ 61,316

(2016). Southwest Power Pool has had functional control over the Laramie River

Facilities since that date. Southwest Power Pool Answer, filed Dec. 21, 2021, at 4,

JA0451.

### C.     The Laramie River Transmission Facilities.

The Laramie River Facilities were constructed in the 1980s in connection with

the construction of the Laramie River Generating Station, an approximately 1700

megawatt electric generating station located in Wyoming. Lincoln Electric Response

to Deficiency Letter, filed Feb. 14, 2022, at 3 ("Deficiency Response"), JA0538.

There are effectively four owners in the Laramie River Facilities: Basin Electric,

Missouri River Energy Services (via contract), Tri-State Generation and

Transmission Association, Inc. (a member of Basin Electric), and Lincoln Electric.

September 29 Order P 5, JA0711. Basin Electric holds the largest share of the

Laramie River Generating Station and Laramie River Facilities and is responsible

for their operation and maintenance. Deficiency Response at 2, JA0537. Basin

Electric also serves as the operating agent for all of the project's joint owners. *Id.*,

JA0537.

As a non-operator minority owner with 12.76% interest in the Laramie River

Facilities, Lincoln Electric does not control, operate, or maintain any of the Laramie

6

River Facilities. When Lincoln Electric joined Southwest Power Pool in 2009, it could not have transferred control of those facilities to the Southwest Power Pool because it could not have provided the Southwest Power Pool with the authority required by the Southwest Power Pool Membership Agreement. In any event, at that time (2009), the Laramie River Facilities were outside of the Southwest Power Pool's geographic footprint.

### D.     Lincoln Electric's Proposed Tariff Modifications.

This proceeding was initiated at FERC when Southwest Power Pool, on behalf of Lincoln Electric, submitted revisions to its Tariff pursuant to FPA Section 205, 16 U.S.C. § 824d, to modify Lincoln Electric's formula rate template. Lincoln Electric is an existing Southwest Power Pool transmission owner, having transferred functional control to Southwest Power Pool of its facilities located in Lincoln, Nebraska in 2009. *Sw. Power Pool, Inc.*, 125 FERC ¶ 61,239 (2008). Lincoln Electric's pricing zone is designated as Zone 16 (Lincoln Electric).

Lincoln Electric's annual transmission revenue requirement is calculated pursuant to its existing formula rate template. The proposed formula rate revisions submitted to FERC updated Lincoln Electric's formula rate to include Lincoln Electric's costs for the Laramie River Facilities. Had FERC accepted Lincoln Electric's revised formula, Lincoln Electric's revenue requirement would have been allocated between Zones 16 and 19, the two zones in which Lincoln Electric owns

transmission facilities. The portion of Lincoln Electric's annual revenue requirement associated with the Laramie River Facilities would have been added to the Zone 19 aggregate zonal revenue requirement, along with the revenue requirements of all of the other transmission owners with transmission facilities located in Zone 19. Recovery of Lincoln Electric's investment in Zone 19 facilities from load in that same zone would compensate Lincoln Electric on the same basis that transmission owners are generally compensated in the Southwest Power Pool region, and in the same manner as other co-owners of the Laramie River Facilities.

Lincoln Electric explained that an allocation of that portion of its revenue requirement associated with the Laramie River Facilities is appropriately recovered from Zone 19 load because that is where the Laramie River Facilities are located and that is the pricing zone that was created when the facilities were integrated with the Southwest Power Pool. Lincoln Electric Answer, filed Dec. 21, 2021, at 6-7 ("Lincoln Electric Dec. 21 Answer"), JA0465-JA0466. Lincoln Electric explained that at the time of Lincoln Electric's integration into Southwest Power Pool in 2009, the project was located outside of the Southwest Power pool region. Lincoln Electric Dec. 21 Answer at 6, JA0465. Lincoln Electric explained that it could not transfer control of the facilities to Southwest Power Pool in 2009 because, as a minority owner of the facilities, it does not operate or maintain the facilities. Lincoln Electric Answer, filed Mar. 22, 2022, at 3-4 ("Lincoln Electric Mar. 22 Answer"), JA0645-

8

JA0646. Lincoln Electric explained that prior to submitting its filing, it consulted with Southwest Power Pool, who confirmed that the Southwest Power Pool's "zonal placement process" was not applicable to Lincoln Electric's ownership interest in the Laramie River Facilities because the facilities are already part of the Southwest Power Pool system. Lincoln Electric Dec. 21 Answer at 7, JA0466.

Responding to protests that Lincoln Electric should have been required to go through a zonal placement process to determine the proper placement of Lincoln Electric's share of the Laramie River Facilities, Southwest Power Pool balked, explaining that that process applies to two situations: (1) integration of a new transmission owner's existing facilities, or (2) purchase by a current Southwest Power Pool transmission owner of existing facilities that were not previously included in its zonal revenue requirement. Southwest Power Pool Answer at 4, JA0451. Southwest Power Pool noted that the zonal placement process does not address facilities that are already under the Tariff and included in Southwest Power Pool's network rates because such facilities have already been placed in a zone. Southwest Power Pool explained that the Laramie River Facilities are already included in Zone 19. *Id.* at 4-5, JA0451-JA0452.

Southwest Power Pool further explained that, while Lincoln Electric's revenue requirement and capacity rights (or use rights) "may not previously have been included under the Tariff, the [Laramie River] facilities themselves have been

included in Zone 19 since Basin [Electric] transferred functional control of its ownership share." *Id.* at 4, JA0451. Southwest Power Pool further explained that the facilities are jointly-owned by four entities, each with joint undivided ownership rights. *Id.*, JA0451. "As such, [Lincoln Electric] is not adding any additional or separate facilities to [Southwest Power Pool]'s functional control, but is merely seeking to recover its revenue requirement" associated with Lincoln Electric's share of facilities that are already under the Southwest Power Pool Tariff and placed in Zone 19. *Id.*, JA0451-JA0452.

### E.    FERC's Orders Rejecting Lincoln Electric's Recovery of its Investment in Zone 19 Facilities.

FERC rejected the proposed revisions to Lincoln Electric's formula rate, finding that Lincoln Electric failed to demonstrate that its proposal to recover the costs associated with its capacity share of the Laramie River Facilities from Zone 19 is just and reasonable. April 15 Order P 32, JA0669. Specifically, FERC found that Lincoln Electric failed to demonstrate that its recovery of its revenue requirement in the Laramie River Facilities was consistent with the cost causation principle that requires that "all approved rates reflect to some degree the costs actually caused by the customer who must pay them," and that "costs be allocated to those who cause the costs to be incurred and reap the resulting benefits." *Id.* (internal quotations omitted), JA0669. FERC further found that Lincoln Electric's proposal is

10

inconsistent with "[the] application of the cost causation principle to zonal rate design, as set forth in Opinion 494." *Id.* P 33, JA0669-JA0670.

FERC stated that its finding is based on its view that Lincoln Electric's "available capacity on the [Laramie River] Facilities is most reasonably characterized as a legacy facility (i.e. one built before Lincoln Electric's integration into [Southwest Power Pool] to primarily service the needs of its own customers)[.]" *Id.* P 33, JA0669-JA0670. FERC further found that Lincoln Electric purchased its ownership interest in the Laramie River Facilities to serve only its own load located in Zone 16, that Lincoln Electric never served load in Zone 19, and that Lincoln Electric currently recovers the cost of its investment in Laramie River Facilities from its customers through bundled retail rates. *Id.* P 33, JA0669-JA0670. FERC concluded that Lincoln Electric's recovery of its investment in the Laramie River Facilities from Zone 19 load "does not reflect Lincoln Electric's prior investment decisions that caused the costs of the facilities at issue to be incurred[.]" *Id.* P 33, JA0669-JA0670.

On rehearing, FERC affirmed its prior findings and conclusion. September 29 Order P 2, JA0709-JA0710. The September 29 Order found that functional control of Lincoln Electric's investment of the Laramie River Facilities had not been transferred to Southwest Power Pool, and therefore, FERC had to determine whether Lincoln Electric's revenue requirement for its "capacity share" of the Laramie River

facilities is appropriately recovered from Zone 19 customers. *Id.* P 20, JA0717-JA0718. The September 29 Order stated that Lincoln Electric "does not explain how its partial ownership in the [Laramie River] Facilities is 'undivided' or how that is relevant here," and FERC did not agree that Lincoln Electric's share in the Laramie River Facilities can be characterized as already part of the Southwest Power Pool system. *Id.* P 21, JA0718-JA0719.

## SUMMARY OF ARGUMENT

The Commission's rejection of Lincoln Electric's recovery of the portion of its transmission revenue requirement related to its undivided ownership interest in the Laramie River Facilities to the transmission pricing zone in which those facilities are located is an unreasoned and unsupported departure from established Commission precedent. The Commission's decision is based on erroneous premises that are either contrary to or unsupported by record evidence.

The Commission first mischaracterizes the very nature of the proceeding by treating it as a zonal placement proceeding to determine in which zone Lincoln Electric's "capacity share" of the Laramie River Facilities should be placed. Southwest Power Pool explained that "[Lincoln Electric] is not adding any additional or separate facilities to [Southwest Power Pool]'s functional control, but is merely seeking to recover its [revenue requirement] associated with its undivided ownership share of facilities that are *already* under the Tariff and placed in Zone

12

19." Southwest Power Pool Answer at 4-5 (emphasis added), JA0451-JA0452. Because the subject facilities have already been placed in a zone, cost recovery should follow that placement.

The Commission's errors are compounded by viewing Lincoln Electric's "capacity share" as "legacy facilities" that are "dedicated" to serving Lincoln Electric and only Lincoln Electric, and thus of no benefit to the transmission users in Zone 19 where the subject 345 kV backbone transmission facilities are located. Lincoln Electric in fact owns an undivided interest in the facilities, which are located approximately 300 miles and two transmission pricing zones away from Lincoln Electric. Lincoln Electric explained that since it integrated into the Southwest Power Pool in 2009, it has taken network transmission service from the Southwest Power Pool for its entire load, rendering the Commission's view that Lincoln Electric's "capacity share" of the facilities is "dedicated" to serving only Lincoln Electric's load factually erroneous.

Holding tightly to these incorrect and unsupported characterizations, and to the fact that Lincoln Electric does not serve load in Zone 19 where the facilities are located, the Commission then proceeds to rely on meaningless or incorrect distinctions to not follow every instance cited by Lincoln Electric in which the Commission previously approved an allocation of a portion of a transmission

owner's revenue requirement to the zone in which the facilities were located even though that transmission owner did not serve load in that zone.

Because these errors infect all of FERC's reasoning, FERC failed to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *PPL Wallingford Energy, LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005). The Commission's decisions thus depart from established precedent, are contrary to and unsupported by record evidence, and are thus arbitrary and capricious and not the result of reasoned decision-making.

## STANDING

Lincoln Electric has suffered injury-in-fact directly caused by the orders under review. By rejecting the revisions to Lincoln Electric's formula rate, FERC has prevented Lincoln Electric from recovering from transmission users located in Zone 19 the portion of Lincoln Electric's revenue requirement associated with its investment in facilities located in Zone 19. A favorable decision will permit Lincoln Electric to add the portion of its revenue requirement associated with its share of the Laramie River Facilities to the aggregate zonal revenue requirement for Zone 19 and receive a revenue distribution for Southwest Power Pool's use of Lincoln Electric's facilities located in Transmission Pricing Zone 19, just as other transmission owners

14

are recovering the costs of their investment in transmission facilities located in Zone 19 from Zone 19 transmission users.

<b>ARGUMENT</b>

## I.    STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA"), this Court is empowered to review orders of the Federal Energy Regulatory Commission and must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right[;] . . . in excess of statutory . . . authority, or limitations, or short of statutory right; . . . [or] unsupported by substantial evidence." 5 U.S.C. § 706(2)(A)–(C), (E); *Hoopa Valley Tribe v. FERC,* 913 F.3d 1099, 1102 (D.C. Cir. 2019).

Under the APA's arbitrary-and-capricious standard, "[t]he Commission's discretion is . . . bounded by the requirements of reasoned decisionmaking." *Am. Gas Ass'n v. FERC,* 593 F.3d 14, 19 (D.C. Cir. 2010). This standard requires the Commission to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (citation omitted), and "to demonstrate that it has made a reasoned decision based upon substantial evidence in the record," *Cal. Pub. Utils.*

15

*Comm'n v. FERC,* 20 F.4th 795, 800 (D.C. Cir. 2021) (quoting *Del. Div. of the Pub. Advoc. v. FERC,* 3 F.4th 461, 465 (D.C. Cir. 2021)). Additionally, FERC must "provide a reasoned explanation for departing from precedent or treating similar situations differently." *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) (internal citations omitted).

## II. THE COMMISSION'S ORDERS IMPROPERLY DEPART FROM PRECEDENT THAT PROVIDES FOR RECOVERY OF A TRANSMISSION OWNER'S REVENUE REQUIREMENT FROM THE TRANSMISSION PRICING ZONE IN WHICH THE TRANSMISSION FACILITIES ARE LOCATED.

### A. The Commission's Evaluation of Lincoln Electric's Proposal for Purposes of "Placing" Lincoln Electric's Ownership Interest in Jointly-Owned Facilities that are Already Part of the Southwest Power Pool Transmission System is Arbitrary and Capricious, Not Supported by the Record and Not the Result of Reasoned Decision-making.

FERC's Orders are in part premised on its foundational error that "neither [Southwest Power Pool]'s Tariff nor its business practices manuals govern the zonal placement of Lincoln Electric's share of the [Laramie River] Facilities" and that the Southwest Power Pool Zonal Placement Process is not controlling. April 15 Order P 31, JA0668. The proposal that Southwest Power Pool submitted to FERC on Lincoln Electric's behalf, pursuant to FPA Section 205, did not request that FERC determine the proper "zonal placement" for Lincoln Electric's undivided ownership interest in the Laramie River Facilities. Lincoln Electric proposed, in relevant part, to recover

16

from Zone 19 the portion of its revenue requirement associated with its undivided ownership interests in facilities that are physically located in and already part of Southwest Power Pool's system. Lincoln Electric Transmittal Letter, filed Nov. 15, 2021, at 1-2,  JA0001-JA0002; Southwest Power Pool Answer at 1-2, JA0448-JA0449.

FERC's error also is grounded on a misunderstanding and mischaracterization of the facts. FERC's Orders make clear that the Commission thought it would not be reasonable or consistent with cost-causation policy for Lincoln Electric to allocate a portion of its revenue requirement to Zone 19 because the Commission treated Lincoln Electric's capacity share as if it were a discrete facility that was never turned over to the Southwest Power Pool and which instead is "dedicated" solely to serving Lincoln Electric's load, such that no other transmission customers could receive any benefit from Lincoln Electric's share of these facilities. *See e.g.,* April 15 Order PP 32-33, JA0669-JA0670; September 29 Order P 35, JA0725-JA0726.

In so finding, FERC failed to properly recognize that Lincoln Electric's use of the Laramie River Facilities has changed over time, and it failed to consider the primary beneficiaries in the context of Southwest Power Pool's zonal framework. Whether or not Lincoln Electric derives some benefit from the Laramie River Facilities is not the central issue. When facilities are integrated into the regional transmission organization, they are placed into a pricing zone based on a number of

17

factors that include the physical location and other attributes of the facilities. Once placed in a pricing zone, cost allocation follows, meaning that the load in the zone in which the facilities are located are deemed to be the primary beneficiaries of those facilities. It no longer matters when the facilities were constructed or for whose benefit. A departure from this cost allocation scheme would require a petition to FERC asking it to determine that the zonal rate structure and the resulting cost allocation scheme set forth in the Commission-approved Southwest Power Pool Tariff is no longer just and reasonable. The proposal submitted to FERC in this case simply involved modifications to the Lincoln Electric formula rate that would recognize Lincoln Electric's investment in facilities that are already part of the system, consistent with Attachment AI of the Southwest Power Pool Tariff, Lincoln Electric Dec. 21 Answer at 16-17, JA0475-JA0476, and compensate Lincoln Electric, consistent with Attachment L of the Southwest Power Pool Tariff. Lincoln Electric Dec. 21 Answer at 16-17, JA0475-JA0476.

FERC's Orders ignore the fact that the Laramie River Facilities are already part of the Southwest Power Pool system in Zone 19, and improperly contemplate that Lincoln Electric's undivided ownership interest in these facilities can be separately "placed" in a zone that is approximately 300 miles away from the facilities. In the September 29 Order, FERC acknowledged that the facilities are owned on a joint and undivided basis but did not consider this fundamental fact to

be relevant to its determination of whether Lincoln Electric should be permitted to recover its revenue requirement from load in the same zone in which the facilities are located. September 29 Order P 21, JA0718- JA0719.

FERC's Orders are grounded on the erroneous assumption that Lincoln Electric's ownership interest in the Laramie River Facilities "is most reasonably characterized as a legacy facility (i.e. one built before Lincoln Electric's integration into [Southwest Power Pool] to primarily serve the needs of its own customers)[.]" April 15 Order P 33, JA0669-JA0670.   Because that error infects all of FERC's reasoning, FERC failed to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *PPL Wallingford Energy LLC v. FERC,* 419 F.3d 1194, 1198 (D.C. Cir. 2005) (internal citations omitted).

FERC's April 15 Order found that Southwest Power Pool's zonal placement process document does not "prescribe a specific zonal placement treatment for *capacity shares* of existing facilities that already have *a portion of their capacity* included [in] a zone." April 15 Order n.67 (emphasis added), JA0668. The Commission is correct in this respect. Because capacity shares, which are essentially use rights, are interests in facilities and not something separate or discrete, they are already addressed by Attachment AI. The placement of transmission facilities necessarily carries with it placement of interests of those facilities.

19

Use rights over facilities are not the subject of zonal placement apart from the placement of the facilities themselves, and the April 15 Order cites to no precedent for treating Lincoln Electric's undivided ownership interest in Zone 19 facilities as though its undivided interest somehow can be divided and then "placed" two zones away from where the facilities are located. FERC treated undivided ownership interests in facilities and use rights over facilities as one and the same – they are not.

That undivided ownership interests and use rights are not the same should require no explanation. Nonetheless, consider that transmission owners offer use rights to non-owner third parties all the time. FERC jurisdictional transmission owners have been required by Commission policy, at least since the issuance of Order No. 888, to provide open access transmission use rights to third party customers. *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996). There, the transmission owner is not exercising use rights and the transmission customers do not acquire any ownership interest in the facilities solely by virtue of an agreement to provide transmission service. A transmission owner can also have use rights over the facilities it owns. Vertically integrated utilities use the transmission systems they own to serve their customers, or to make wholesale sales of power to other utilities. But, as relevant here, the zonal placement

20

of the facilities is based on the physical facilities themselves, not on the destination of deliveries under a transmission service agreement. *See Neb. Pub. Power Dist. v. FERC*, 957 F.3d 932, 936-37 (8th Cir. 2020) (Explaining that Southwest Power Pool uses four criteria in zonal placement, including the degree to which the facilities are embedded within a pre-existing zone and the degree to which a new TO's facilities are integrated with existing facilities). The fact that an owner also has use rights does not make ownership and use one and the same, nor do use rights change the physical location of the facilities being used.

The Commission nevertheless treats this proceeding as involving zonal placement of Lincoln Electric's capacity share in existing facilities, ignoring Southwest Power Pool's explanation that such a process is not needed or necessary here. April 15 Order PP 32-34, JA0669-JA0670. As Southwest Power Pool explained:

> [T]he collective [Missouri Basin Power Project] transmission facilities [which include the Laramie River Facilities] are *jointly* owned by four entities, each with joint *undivided* ownership rights. As such, [Lincoln Electric] is not adding any additional or separate facilities to [Southwest Power Pool]'s functional control, but is merely seeking to recover its [revenue requirement] associated with its undivided ownership share of facilities that are *already* under the Tariff and placed in Zone 19. Because the physical facilities are already placed in Zone 19, the Zonal Placement Process by its very language does not apply, and [Southwest Power Pool] did not err by not applying it anew to facilities that are already physically located in an existing transmission pricing Zone.

Southwest Power Pool Answer at 4-5 (emphasis added), JA0451-JA0452. Once the facilities have been placed in a zone, the owner of those facilities may then begin to recover its investment in those facilities from the load in that zone. Southwest Power Pool explained how it treats recovery of investment of joint ownership in existing Southwest Power Pool facilities:

> [Southwest Power Pool] has consistently adhered to the plain language of the Zonal Placement Process document by *not* applying the process to facilities once they have already been placed in a Zone, including Zone 19. For example, when [North Iowa Municipal Electric Cooperative Association] requested that [Southwest Power Pool] file its [revenue requirement] for recovery of its ownership share of existing Zone 19 facilities, [Southwest Power Pool] did not apply the Zonal Placement Process. Notably, Basin [Electric] intervened in support of that filing and did not object to the lack of a zonal placement analysis or process in that proceeding. Like [North Iowa Municipal Electric Cooperative Association], [Lincoln Electric] is not seeking to place additional transmission facilities in Zone 19, but instead is seeking cost recovery for its ownership share of facilities that are already located in Zone 19. The Zonal Placement Process does not come into play…

Southwest Power Pool Answer at 5 (citations omitted)(emphasis in original), JA0452. Contrary to the April 15 Order's conclusion, that does not mean that the Zonal Placement Process document plays no role, but rather that the role *was already played* when the Southwest Power Pool placed the Laramie River Facilities in Zone 19. FERC's Orders ignore Southwest Power Pool's explanation of its practice of submitting tariff revisions for purposes of recovering a joint owner's investment in

facilities that have already been placed and are already part of the Southwest Power Pool transmission system.

Southwest Power Pool further explained that, even if it had performed a zonal placement process here, it still would have placed Lincoln Electric's share of the Laramie River Facilities in Zone 19. *Id.* at 5-7, JA0452-JA0454. The Laramie River Facilities are located in Zone 19, are integrated in Zone 19, and are physically remote from Zone 16 (the Lincoln Electric Zone). *Id.*, JA0452-JA0454. Southwest Power Pool explained the significance of the physical location of the facilities in the placement process, citing to the level of integration between the subject transmission facilities and existing transmission pricing zones, and including whether the facilities are embedded within an existing zone. For the subject facilities, Southwest Power Pool explained,

> Here, the [Missouri Basin Power Project] facilities [which include the Laramie River Facilities] are neither interconnected to nor integrated within Zone 16 but instead are interconnected with and already located in Zone 19. [Missouri Basin Power Project] owners Basin [Electric] and [Missouri River Energy Services] already recover their shares of the costs of the [Missouri Basin Power Project] facilities in Zone 19 rates. The combined capacity of the [Missouri Basin Power Project] facilities transferred to [Southwest Power Pool]'s functional control exceeds the long-term transmission reservations from the Laramie River Station, meaning that [Southwest Power Pool] can use the excess capacity transferred to its functional control to provide transmission service to other customers in Zone 19…

> Indeed, the [Missouri Basin Power Project] facilities are hundreds of miles away from Zone 16. As Basin [Electric] explains on its website, the [Missouri Basin Power Project] facilities are located primarily in Wyoming, with portions crossing into northern Colorado and western Nebraska. In contrast, Zone 16 is located on the far eastern edge of Nebraska, hundreds of miles away. Standing between the [Lincoln Electric] Zone and the [Missouri Basin Power Project] is another [Southwest Power Pool] transmission pricing Zone, the Nebraska Public Power District Zone 17. The [Missouri Basin Power Project] facilities, including [Lincoln Electric]'s undivided joint ownership interest, are clearly far closer to and more integrated with Zone 19 than they are with Zone 16, lending further support to including [Lincoln Electric]'s [revenue requirement] and ownership share in Zone 19. Because the [Missouri Basin Power Project] facilities are physically interconnected to and integrated with Zone 19 and other [Missouri Basin Power Project] owners' respective [revenue requirement]s are included in Zone 19 rates, including [Lincoln Electric]'s [revenue requirement] in the same Zone's rates is just and reasonable, and the Commission should reject arguments to the contrary.

Southwest Power Pool Answer at 6-7, JA0453-JA0454. In other words, it is by design, not mistake or oversight, that the placement process pertains to the facilities themselves and not to a capacity share or use rights in the facilities. Once the facilities themselves have been placed, the rate recovery for an owners' investment in those facilities necessarily follows, consistent with established Commission precedent on zonal rate recovery and in accordance with the Southwest Power Pool Tariff. FERC's failure to follow its prior decisions that accepted placement of the Laramie River Facilities in Zone 19 without a reasoned explanation that is supported by substantial record evidence is arbitrary and capricious.

24

**B.**     **The Commission's Finding that Lincoln Electric's Share of the Laramie River Facilities Are Legacy Facilities that are Dedicated to Serving Only Lincoln Electric's Load, and that Do Not Serve Zone 19 Load, is Unsupported by and Contrary to Substantial Record Evidence.**

Focused on the timing of Lincoln Electric's investment, FERC found that Lincoln Electric's "available capacity on the [Laramie River] Facilities is most reasonably characterized as a legacy facility (i.e. one built before Lincoln Electric's integration into Southwest Power Pool to primarily serve the needs of its own customers)[.]" April 15 Order P 33, JA0669-JA0670. FERC repeatedly and incorrectly describes Lincoln Electric's ownership interest in the Laramie River Facilities as dedicated to serving only Lincoln Electric's load even though Southwest Power Pool advised that "[t]he combined capacity of the [Missouri Basin Power Project] facilities transferred to Southwest Power Pool's functional control exceeds the long-term transmission reservations from the Laramie River Station, meaning that [Southwest Power Pool] can use the excess capacity transferred to its functional control to provide transmission service to other customers in Zone 19." Southwest Power Pool Answer at 6-7, JA0453-JA0454.

**1. The Laramie River Transmission Facilities cannot reasonably be accepted as networked "backbone" facilities for purposes of placing the Laramie Transmission Facilities in Zone 19 but not for the purposes of Lincoln Electric's recovery of its investment in those same facilities from Zone 19.**

25

Contrary to FERC's finding, the Laramie River Facilities were not constructed for the sole use or benefit of Lincoln Electric. The Laramie River Facilities consist of several Extra High Voltage lines stemming from the Laramie River Project to surrounding areas. Deficiency Response at 5, JA0540. The Laramie River Facilities were developed as part of the overall project to provide a transmission outlet for the project's output. *Id.* at 3, JA0538. Certain of the Laramie River Facilities are located in the Western Interconnection and certain are located in the Eastern Interconnection. The Eastern Interconnection facilities are located in the Upper Missouri Zone. *Id.* n.12, JA0541.

Significantly, the Laramie River Facilities do not provide a complete path from the Laramie River Project to Lincoln Electric load, and none of the Laramie River Facilities connect to any Lincoln Electric facilities. *Id.* at 5, JA0540. Lincoln Electric's load is 300 miles away from the nearest Laramie River Facilities substation. *Id.*, JA0540.

Contrary to FERC's Orders, the record shows that the Laramie River Facilities transmit power from the Laramie River Project to the bulk electric system and are among the "backbone" facilities that make up the Integrated System that supports the load throughout Zone 19. *Id.* at 3, 6-7, JA0538, JA0541-JA0542. The following provides Basin Electric's and Western Area Power Administration's own

description of the Zone 19 transmission facilities that were transferred to Southwest

Power Pool's control in 2015, which included the Laramie River Facilities:

> The [Integrated System] is generally described as the backbone of the bulk electric transmission system in the Upper Great Plains region of the United States. The [Integrated System] includes approximately 9,500 miles of transmission lines rated 115 kV through 345 kV and stretches across a seven-state region. The system is bounded on the north by the Canadian border and reaches into Nebraska on the south. From west to east, the [Integrated System] spans from eastern Montana and Wyoming into western Minnesota and Iowa. The [Integrated System] is unique in that it spans the Eastern and Western Interconnections of the U.S. electric grid. The [Integrated System] includes the combined transmission facilities of the [Integrated System] Parties ([Western Area Power Administration - Upper Great Plains Region], Basin Electric, and [Heartland Consumers Power District]). It also includes, through facility credits, facilities owned by Northwestern Energy in South Dakota and Missouri River Energy Services. The [Integrated System] is a jointly-developed system that originally evolved from the need to deliver Federal hydropower from the [Pick-Sloan Missouri Basin Program-Eastern Division] to preference power customers in the region. The system has been planned, expanded and operated to serve the transmission customers in the region on an integrated single-system basis under a common open access transmission tariff ("Western [Tariff]")...

Southwest Power Pool Transmittal Letter for Docket No. ER14-2850 at 6-7, filed

Sep. 11, 2014. The Integrated System became part of the Southwest Power Pool

region as of October 1, 2015, and as a result of that integration Zone 19 was

established. *Sw. Power Pool, Inc.*, 149 FERC ¶ 61,113 (2014).

27

Unlike the owners of the Integrated System, whose territory spans several states, Lincoln Electric's service territory is essentially Lincoln, Nebraska. Lincoln Electric Request for Rehearing at 11-13, filed May 16, 2022, JA0685-JA0687. Figure 1 below provides an illustrative map.



*Figure 1*

The Lincoln Electric Zone (Zone 16) is depicted above by a medium shade of blue near the eastern border of Nebraska. Zone 16 is separated from the Laramie River Facilities by the area shaded in a slightly darker blue that covers a majority of the rest of the state of Nebraska (Nebraska Public Power District - Zone 17). The Upper Missouri Zone (Zone 19) which includes the Integrated System is shaded in green

and surrounds Nebraska to the west, north and east of Zone 17. Zone 19 spans parts of Wyoming, Nebraska, Iowa, Minnesota, South Dakota, North Dakota and Montana. (Areas shaded in lighter blue in parts of Kansas and Missouri represent other utilities that are not material to these proceedings.)

### 2. FERC's finding that Lincoln Electric's ownership share in the Laramie River Facilities was and remains dedicated to serve Lincoln Electric's load is contrary to the record evidence.

Lincoln Electric invested in the Laramie River Facilities to help support delivery of the output of the Laramie River Generating Project to surrounding areas. Deficiency Response at 3, JA0538. However, FERC's repeated mantra that Lincoln Electric's capacity share of these bulk power facilities was and remains dedicated to serving Lincoln Electric's load, s*ee e.g.*, September 29 Order PP 10-12, 14-15, 20-21, 27-30, 40-41, JA0713-JA0714, JA0715, JA0717-JA0719, JA0721-JA0723, JA0727-JA0728, and only Lincoln Electric's load is not accurate and is not supported by record evidence.

While the April 15 Order claims that its finding that Lincoln Electric's capacity share in the Laramie River Facilities is dedicated to serving only Lincoln Electric's load is "based on this record," the Order cites only to Lincoln Electric's own acknowledgement that "it purchased its ownership interest in the [Laramie River] Facilities as a reliable source of capacity and energy needed to serve its load

in Zone 16," April 15 Order P 33, JA0669-JA0670, that its load is located entirely in Zone 16, and that Lincoln Electric currently recovers the costs of its investment in the Laramie River Facilities from its retail bundled load customers. The April 15 Order cites to a section of Lincoln Electric's Answer that is taken out of context. Deficiency Response at 4-5, JA0539-JA0540. Lincoln Electric also explained that the Laramie River Facilities are backbone facilities that were constructed to move output from the Laramie River Project to the bulk transmission system in different directions. *Id.* at 3, JA0538. Lincoln Electric also explained that the Laramie River Facilities are remote from the Lincoln Electric system, are not interconnected to the Lincoln Electric system, and that they do not form a complete path to Lincoln Electric's load. *Id.* at 5, JA0540.

FERC's conclusory finding that Lincoln Electric's investment "continues to serve that [Zone 16] load" fails to consider that investment in the context of Southwest Power Pool's zonal rate structure, fails to consider that Lincoln Electric relies exclusively on Southwest Power Pool's network transmission service, and gives no consideration to the fact that the physical location of these facilities hundreds of miles away in Zone 19 means that transmission users in Zone 19 are the primary beneficiaries of these facilities. April 15 Order P 33, JA0669-JA0670. FERC instead is focused only on the fact that Lincoln Electric does not serve load in Zone 19.

On rehearing, FERC acknowledged that Lincoln Electric's use of the Laramie River Facilities has changed over time but is then dismissive of the fact that this is no longer true. In denying rehearing, FERC stated:

> We acknowledge Lincoln Electric's representations that its use of its share in the [Laramie River] Facilities has changed over time and that Lincoln Electric currently relies "exclusively on [network] service to deliver the [Laramie River] [Facilities'] output to" Lincoln Electric.[] However, Lincoln Electric fails to support how this fact justifies a different outcome for its share of the [Laramie River] Facilities in this proceeding, given that transmission owning members of [Southwest Power Pool] in general turn over control of their facilities to [Southwest Power Pool] to become part of the [Southwest Power Pool] regional transmission system and then take regional network service over the [Southwest Power Pool] system to meet their load-serving responsibilities.

September 29 Order P 31 (citations omitted), JA0723-JA0724. Because Lincoln Electric now relies exclusively on network service from the Southwest Power Pool, as the September 29 Order acknowledges, Southwest Power Pool can offer available capacity to load in Zone 19. Southwest Power Pool explained that the combined capacity of the Laramie River Facilities transferred to Southwest Power Pool's functional control exceeds the long-term transmission reservations from the Laramie River Project, meaning that Southwest Power Pool can use excess capacity to provide transmission service to other customers in Zone 19. Revenues from that service can be collected only by the Zone 19 transmission owners, in accordance with Southwest Power Pool's Attachment L. The Commission's rejection

31

necessarily means that, even though Lincoln Electric holds an undivided interest in all of the jointly-owned Laramie River Facilities, it would be barred from receiving any share of these revenues from the sale of excess capacity.

Basin Electric and Missouri River Energy Services are currently recovering their revenue requirement revenues from all load in Zone 19 for their investment in the Laramie River Facilities, not just from their native load customers. Southwest Power Pool Answer at 6-7, JA0453-JA0454. The Commission's rejection means that Lincoln Electric is not afforded this same opportunity to recover its investment and it will not receive an appropriate share of revenue from jointly owned facilities that have been transferred to the Southwest Power Pool's functional control, rendering the Orders arbitrary and capricious.

**3. The Commission's reliance on the fact that Lincoln Electric serves no load in Zone 19 is contrary to precedent and is not the result of reasoned decision-making.**

The Commission's explanation for treating Lincoln Electric differently than other joint owners is the fact that Lincoln Electric does not serve load in Zone 19. This is irrelevant because there is no provision in the Southwest Power Pool Tariff and no Commission precedent that imposes any such requirement. Lincoln Electric cited several cases in support of its recovery. And, despite acknowledging in the September 29 Order that serving load in a pricing zone is not a requirement for rate

32

recovery, FERC continues to base its differing treatment for Lincoln Electric as compared to the co-owners in the Laramie River Facilities on the basis that Lincoln Electric does not have any load in Zone 19.

Circumstances similar to the instant proceeding were considered in *PJM Interconnection, L.L.C.,* 94 FERC ¶ 61,295, *reh'g denied,* 95 FERC ¶ 61,217 (2001) ("*Allegheny*"*).* In *Allegheny,* PJM Interconnection, L.L.C ("PJM Interconnection") filed revisions to its Tariff to enable Allegheny Electric Cooperative ("Allegheny") to recover a portion of its transmission revenue requirement associated with a 42-mile line owned by Allegheny in the PPL Group Zone where the line was located. *Allegheny*, 94 FERC ¶ 61,295, at 62,074 (2001). In exchange for the purchase of that section of transmission, Allegheny was afforded use of PPL Electric Utilities Corporation's ("PPL Electric") full bulk power transmission system for the purpose of transmitting its 10% share of power from the Susquehanna Steam Electric Station in the PPL Group Zone to any of PPL Electric's interconnection points, as well as to its interconnection with the PJM Interconnection transmission system. *Id.* The arrangement enabled Allegheny to have its Susquehanna Steam Electric Station power and energy transmitted to a different zone, where 98% of Allegheny's load was located, or to any zone directly connected with PPL Electric or PJM Interconnection. *Id.* PPL Electric complained that PJM Interconnection's filing would result in cost shifts to, or subsidization by its load, which PPL Electric

purported to be inconsistent with the Commission's cost causation pricing principles. *Id.* at 62,076-78. The Commission concluded that it was reasonable to allocate Allegheny's revenue requirements to the PPL Group Zone. *Id.* at 62,078. Among other things, the Commission found that the line in question was interconnected with PPL Electric's other facilities, PPL Electric's customers had the benefit of using Allegheny's section of the line, and Allegheny's section of the line was no less part of the PPL Electric/PJM Interconnection bulk power system than PPL Electric's own facilities. *Id.*

FERC attempts to distinguish *Allegheny* by stating that the load in the zone in which the facilities were sited had "full benefit and use of Allegheny's facilities," whereas here, Lincoln Electric's share of the Laramie River Facilities "is solely used to serve its own Zone 16 load, and is not available for use by Zone 19 customers" and "is neither used nor needed to serve Zone 19 load." April 15 Order PP 36-37, JA0671-JA0672.

FERC opined that PPL Electric and its customers had the full benefit of use of Allegheny's exclusively owned 42-mile section of transmission, whereas Lincoln Electric does not exclusively own a segment of the Laramie River Facilities, but rather owns "a capacity share which is solely used to serve its own Zone 16 load and is not available for use by Zone 19 customers. *Id.* P 37, JA0671-JA0672. The Commission fails to articulate why the exclusive nature of Allegheny's ownership

has any relevance here, as distinct from the fact that the Laramie River Facilities are co-owned on an undivided basis. This is a distinction without a difference and does not articulate a rational basis upon which its conclusion can be relied. The Commission also relies on its error that permeates every finding, stating further that, "the costs of Lincoln Electric's capacity share of the [Laramie River] Facilities were incurred to serve its Zone 16 load; and the capacity share is neither used nor needed to serve Zone 19 load." September 29 Order P 13, JA0714-JA0715. This conclusion is contrary to the record and is not the result of reasoned decision-making.

Lincoln Electric also cited *Westar*, in which the Commission permitted Westar Energy Inc. ("Westar") to allocate a portion of its annual transmission revenue requirement to the zone in which the facilities are located even though Westar does not serve load in that zone. *Sw. Power Pool, Inc.*, 120 FERC ¶ 61,297 (2007) ("*Westar*"). Westar had purchased the subject transmission facilities from Oklahoma Gas & Electric, but Westar does not serve load in the Oklahoma Gas & Electric zone.

FERC states that it approved Westar's allocation of it its revenue requirement to the zone in which the facilities are located because load in the Oklahoma Gas & Electric pricing zone was using, and thus benefitting, from the facilities now owned by Westar. April 15 Order P 35, JA0670-JA0671 (citing *Westar*, 120 FERC ¶ 61,297, P 22 (2007)). FERC departs from this precedent, stating that "although the

35

[Laramie River] Facilities are located in Zone 19, Lincoln Electric's capacity share does not serve and has not been used to serve Zone 19 customers…" April 15 Order P 35, JA0670-JA0671.

There is no record support for that conclusion, which actually ignores the explanations by the Southwest Power Pool that the Laramie River Facilities are available for use in Zone 19, and Lincoln Electric's explanation that it relies on tariff network service, not its "capacity share," to serve its load, thus belying the Commission's immovable conclusion that only Lincoln Electric uses and benefits from its undivided interest in the Laramie River Facilities.

**4. Recovery based on the physical location of the facilities is neither inherently unjust and unreasonable nor dependent on an express tariff provision requiring such placement.**

The Commission's prior decisions providing for cost recovery by transmission owners from a zone different from the zone in which the transmission owner serves its load demonstrates the unreasonableness of the Commission's holding here that cost-causation in a zonal license plate structure does not support Lincoln Electric's recovery from Zone 19. The orders relied on by Lincoln Electric to support its recovery involved facilities within the Southwest Power Pool, facilities within the Midcontinent Independent System Operator, Inc. ("Midcontinent System") region, and facilities within the PJM Interconnection, all of which utilize

36

a zonal, or license plate, rate structure for base transmission rates. Steadfast in its refusal to acknowledge that the location of the Laramie River Facilities is not only relevant but a key factor, FERC attempts to distinguish this precedent cited by Lincoln Electric in support of its recovery from Zone 19. *See* September 29 Order PP 11-13, 25, 33, 35, JA0714-JA0715, JA0720-JA0721, JA0724, JA0725-JA0726.

For example, the Order dismisses Lincoln Electric's reliance on *Midcontinent Indep. Sys. Operator, Inc.*, Opinion No. 564, 164 FERC ¶ 61,194 (2018) ("*Rochester*") involving Schedule 9 cost recovery within the Midcontinent System. There, the Commission approved recovery of costs associated with jointly-owned 345 kV facilities from the zone in which the facilities were located, and in which Rochester Public Utilities served no load. FERC observed that in *Rochester*, the Midcontinent System Tariff requires the allocation of the transmission revenue requirement to the zone in which the facility is physically located, unless otherwise authorized by the Commission upon application by a transmission owner, whereas the Southwest Power Pool Tariff contains no such language or default zonal placement method based on the location of the facilities. April 15 Order P 34, JA0670; September 29 Order P 35, JA0725-JA0726.

That the Southwest Power Pool Tariff does not contain the same or similar default method that the Midcontinent System Tariff contains is not a meaningful response to the fact that each of the regional transmission organizations rely in no

37

small part on the location of the facilities. In its Answer to protests in support of Lincoln Electric's recovery, Southwest Power Pool expressly stated as much. By approving the Midcontinent System Tariff, as well as its application in *Rochester*, the Commission approved the underlying principle that physical location, regardless of where the transmission owner's load is served, is a valid basis for zonal placement. *See Rochester,* 164 FERC ¶ 61,194 (2018). And significantly, there is no provision in Southwest Power Pool Tariff that requires a different result than what Southwest Power Pool and Lincoln Electric proposed in this proceeding.

Indeed, if recovery based on physical location of the facilities was not a significant factor for purposes of determining cost recovery, then the Commission could not have approved the cost recovery proposals in any of the cases relied on by Lincoln Electric that FERC attempts to distinguish. September 29 Order PP 11-13, 25, 35-37, JA0714-JA0715, JA0720-JA0721, JA0725-JA0726.

The *Allegheny* case in the PJM Interconnection region also undermines any suggestion that cost recovery based on location (even where remote from the owner's load) is unjust and unreasonable unless done pursuant to an express tariff provision. The PJM Interconnection Tariff, like the Southwest Power Pool Tariff, did not have a default provision similar to the Midcontinent System Tariff's default provision yet the Commission allowed Allegheny to allocate to the PPL Group Zone its revenue requirement for facilities located in the PPL Group Zone even though

38

Allegheny's load is located primarily in another zone (the GPU Energy Zone). *Allegheny*, 94 FERC ¶ 61,295 (2001). FERC's approval in *Allegheny* did not flow from an express tariff requirement, yet the location of the facilities was a key factor in FERC's cost recovery analysis found central to its approval, even where the transmission owner seeking cost recovery did not serve load in the zone from which costs were being recovered.

### 5. The Commission's reliance on the fact that Lincoln Electric does not serve load in Zone 19 is contrary to its policy that there is no such requirement.

The Commission's findings have the effect of imposing a requirement here that a transmission owner must serve its own native load in the zone, when it has not been imposed elsewhere, rendering its decision arbitrary and capricious. The Commission's dismissiveness of Lincoln Electric's reliance on Commission precedent elsewhere is in part based on immaterial factual distinctions that do not support a different legal result.

According to FERC, *Westar* is distinguishable because, although the Laramie River Facilities are located in Zone 19, Lincoln Electric's capacity share "does not serve and has not been used to serve Zone 19 customers, and the costs of Lincoln Electric's capacity share were not incurred to serve Zone 19 customers." April 15 Order P 35, JA0670-JA0671. By contrast, according to FERC, in *Westar* "the Spring Creek plant and associated transmission facilities were used to serve customers in

39

the [Oklahoma Gas & Electric] zone before Westar acquired the assets, and Westar assumed a contractual obligation to continue to serve such customers after it acquired the assets." *Id.,* JA0670-JA0671.

Lincoln Electric knows of no requirement in any tariff, rule, regulation, statute, or Commission precedent that a transmission owner must serve load in a zone in order to be able to allocate to that zone a revenue requirement associated with transmission facilities located in that zone. The Commission cites no such requirement. As discussed *supra,* the Commission in several instances has approved recovery of costs for investment in transmission located in a zone separate from the zone in which the transmission owner served load, and has done so in the PJM Interconnection, Midcontinent System, and Southwest Power Pool regional transmission organizations. The Commission could not have approved such cost recovery proposals if it were *per se* unjust and unreasonable to allocate transmission costs to a zone separate from that in which the transmission owner serves load.

## C.    The Commission's Conclusory Finding that Lincoln Electric's Proposal is Inconsistent with the Cost Causation Principles is Arbitrary and Capricious.

FERC relies on Opinion No. 494 to support its rejection of Lincoln Electric's rate recovery from load in Zone 19, stating that Lincoln Electric's proposal is inconsistent with the application of the cost causation principle to zonal rate design,

40

as set forth in Opinion No. 494. April 15 Order P 33, JA0669-JA0670. On rehearing, FERC maintained that a zonal rate design that allocates the costs of legacy facilities to the customers for whom they were constructed and whom they continue to serve is consistent with the cost-causation principle. September 29 Order P 34, JA0724-JA0725. Applying that conclusion here, said FERC, "in the context of [Southwest Power Pool]'s zonal rate design, it would be inconsistent with the cost causation principle to allocate the costs of Lincoln Electric's share in the [Laramie River] Facilities to load in Zone 19 because Lincoln Electric's share in the [Laramie River] Facilities was acquired to serve customers in Zone 16 and continues to serve those customers." *Id.* P 34, JA0724-JA0725. The Commission's analysis is once again premised on its incorrect view that Lincoln Electric's capacity share of the Laramie River Facilities was constructed solely for Lincoln Electric load.

Opinion No. 494 affirmed the justness and reasonableness of PJM Interconnection's zonal, license plate structure explaining that almost all of the transmission facilities controlled by PJM Interconnection "were built by vertically-integrated utilities to meet the needs of the utilities' native load customers" and that under this zonal rate design, the PJM Interconnection pricing zones are "typically based on the boundaries of individual transmission owners or groups of transmission owners." *PJM Interconnection, L.L.C.*, 119 FERC ¶ 61,063, PP 7, 10 (2007)("Opinion No. 494"). FERC's Orders do not attempt to reconcile its reliance

41

on Opinion No. 494 with the fact that the Laramie River Facilities were constructed within the boundary of the Western Area Power Administration and Basin Electric Integrated System service territory and not within (or remotely close to) Lincoln Electric's boundary.

Network facilities located hundreds of miles away from a transmission owner's own system and load center are not classic legacy facilities in the context of Opinion No. 494. Indeed, no part of the Laramie River Facilities are located in the same, sub-regional zone as is Lincoln Electric's system or load. As Lincoln Electric explained in its response to the deficiency letter, the Laramie River Facilities consist of several Extra High Voltage lines stemming from the Laramie River Project to surrounding areas. Deficiency Response at 5, JA0540. The Laramie River Facilities move output from the Laramie River Project to the bulk electric system and are part of the bulk electric system. *Id.* at 3-5, JA0538-JA0540. The facilities do not provide for a complete path from the Laramie River Project to Lincoln Electric's load, and none of the Laramie River Facilities are connected to any of Lincoln Electric's facilities. *Id.* at 5, JA0540. Lincoln Electric's load is 300 miles away from the nearest Laramie River Facilities substation. *Id.*, JA0540. Lincoln Electric does not own discrete segments of the Laramie River Facilities, nor does it operate or maintain any of these Laramie River Facilities. FERC must "provide a reasoned explanation for departing from precedent or treating similar situations differently."

42

*W. Deptford Energy, LLC v. FERC,* 766 F.3d 10, 20 (D.C. Cir. 2014) (internal citations omitted). FERC must also "respond meaningfully to the arguments raised before it," *TransCanada Power Mktg. Ltd. v. FERC,* 811 F.3d 1, at 12 (D.C. Cir. 2015) (internal citations omitted), and unless it "answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned." *In re NTE Conn., LLC,* 26 F.4th 980, at 989 (D.C. Cir. 2022) (quoting *PPL Wallingford Energy LLC v. FERC,* 419 F.3d 1194, 1198 (D.C. Cir. 2005)).

## CONCLUSION

Lincoln Electric respectfully requests that the Court reverse the Commission's decisions as contrary to law, arbitrary and capricious, unsupported by and contrary to record evidence, and devoid of reasoned decision-making.

Respectfully submitted,

*/s/ Debra D. Roby*
Debra D. Roby
Alan I. Robbins
Thomas B. Steiger III
Washington Energy Law LLP
900 17th Street NW, Suite 500A
Washington, DC 20006
droby@washingtonenergylaw.com
202.326.9313

*Attorneys for Lincoln Electric System*

July 26, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Rules 32(a)(7) and 32(g) of the Federal Rules of Appellate Procedure, I certify that this document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), this document contains 9,801 words.

I further certify, pursuant to Fed. R. App. P. 27(d)(1)(E), that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this initial brief has been prepared in Times New Roman 14-point font using Microsoft Word.

Respectfully submitted,

*/s/ Debra D. Roby*
Debra D. Roby
Alan I. Robbins
Thomas B. Steiger III
Washington Energy Law LLP
900 17th Street NW, Suite 500A
Washington, DC 20006
droby@washingtonenergylaw.com
202.326.9313

*Attorneys for Lincoln Electric System*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of July, 2023, I filed the foregoing Final

Initial Brief with the Clerk of the Court using the CM/ECF System, which will send

notice of such filing to all registered CM/ECF users.


Respectfully submitted,

*/s/ Debra D. Roby*
Debra D. Roby
Alan I. Robbins
Thomas B. Steiger III
Washington Energy Law LLP
900 17th Street NW, Suite 500A
Washington, DC 20006
droby@washingtonenergylaw.com
202.326.9313

*Attorneys for Lincoln Electric System*


July 26, 2023

# APPENDIX A

# ADDENDUM OF STATUTES AND REGULATIONS

## TABLE OF CONTENTS

Administrative Procedure Act

    5 U.S.C. § 706…………………………………………………………...…A1

Federal Power Act

    16 U.S.C. § 824d…………………………………………………..…A2

    16 U.S.C. § 825l………………………………………….……..A5

vides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### §705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### §706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

#### Statutory Notes and Related Subsidiaries

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801. Congressional review.
802. Congressional disapproval procedure.
803. Special rule on statutory, regulatory, and judicial deadlines.
804. Definitions.
805. Judicial review.
806. Applicability; severability.
807. Exemption for monetary policy.
808. Effective date of certain rules.

### §801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of

mental orders in the premises as it may find necessary or appropriate, and may by any such supplemental order modify the provisions of any previous order as to the particular purposes, uses, and extent to which, or the conditions under which, any security so theretofore authorized or the proceeds thereof may be applied, subject always to the requirements of subsection (a) of this section.

**(c) Compliance with order of Commission**

No public utility shall, without the consent of the Commission, apply any security or any proceeds thereof to any purpose not specified in the Commission's order, or supplemental order, or to any purpose in excess of the amount allowed for such purpose in such order, or otherwise in contravention of such order.

**(d) Authorization of capitalization not to exceed amount paid**

The Commission shall not authorize the capitalization of the right to be a corporation or of any franchise, permit, or contract for consolidation, merger, or lease in excess of the amount (exclusive of any tax or annual charge) actually paid as the consideration for such right, franchise, permit, or contract.

**(e) Notes or drafts maturing less than one year after issuance**

Subsection (a) shall not apply to the issue or renewal of, or assumption of liability on, a note or draft maturing not more than one year after the date of such issue, renewal, or assumption of liability, and aggregating (together with all other then outstanding notes and drafts of a maturity of one year or less on which such public utility is primarily or secondarily liable) not more than 5 per centum of the par value of the other securities of the public utility then outstanding. In the case of securities having no par value, the par value for the purpose of this subsection shall be the fair market value as of the date of issue. Within ten days after any such issue, renewal, or assumption of liability, the public utility shall file with the Commission a certificate of notification, in such form as may be prescribed by the Commission, setting forth such matters as the Commission shall by regulation require.

**(f) Public utility securities regulated by State not affected**

The provisions of this section shall not extend to a public utility organized and operating in a State under the laws of which its security issues are regulated by a State commission.

**(g) Guarantee or obligation on part of United States**

Nothing in this section shall be construed to imply any guarantee or obligation on the part of the United States in respect of any securities to which the provisions of this section relate.

**(h) Filing duplicate reports with the Securities and Exchange Commission**

Any public utility whose security issues are approved by the Commission under this section may file with the Securities and Exchange Commission duplicate copies of reports filed with the Federal Power Commission in lieu of the reports, information, and documents required under sections 77g, 78l, and 78m of title 15.

(June 10, 1920, ch. 285, pt. II, §204, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 850.)

**Executive Documents**

TRANSFER OF FUNCTIONS

Executive and administrative functions of Securities and Exchange Commission, with certain exceptions, transferred to Chairman of such Commission, with authority vested in him to authorize their performance by any officer, employee, or administrative unit under his jurisdiction, by Reorg. Plan No. 10 of 1950, §§1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out in the Appendix to Title 5, Government Organization and Employees.

**§ 824d. Rates and charges; schedules; suspension of new rates; automatic adjustment clauses**

**(a) Just and reasonable rates**

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

**(b) Preference or advantage unlawful**

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

**(c) Schedules**

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

**(d) Notice required for rate changes**

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein pro-

vided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e) Suspension of new rates; hearings; five-month period**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined**

(1) Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

  (A) whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

  (B) whether any such clause reflects any costs other than costs which are—

    (i) subject to periodic fluctuations and

    (ii) not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

(2) Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

(3) The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

  (A) modify the terms and provisions of any automatic adjustment clause, or

  (B) cease any practice in connection with the clause,

if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

(4) As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

**(g) Inaction of Commissioners**

**(1) In general**

With respect to a change described in subsection (d), if the Commission permits the 60-day period established therein to expire without issuing an order accepting or denying the change because the Commissioners are divided two against two as to the lawfulness of the change, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum—

  (A) the failure to issue an order accepting or denying the change by the Commission shall be considered to be an order issued by the Commission accepting the change for purposes of section 825*l*(a) of this title; and

  (B) each Commissioner shall add to the record of the Commission a written statement explaining the views of the Commissioner with respect to the change.

**(2) Appeal**

If, pursuant to this subsection, a person seeks a rehearing under section 825*l*(a) of this title, and the Commission fails to act on the merits of the rehearing request by the date that is 30 days after the date of the rehearing request because the Commissioners are divided two against two, as a result of vacancy, incapacity, or recusal on the Commission, or if the Commission lacks a quorum, such person may appeal under section 825*l*(b) of this title.

(June 10, 1920, ch. 285, pt. II, § 205, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 851; amended Pub. L. 95–617, title II, §§ 207(a), 208, Nov. 9, 1978, 92 Stat. 3142; Pub. L. 115–270, title III, § 3006, Oct. 23, 2018, 132 Stat. 3868.)

Editorial Notes

AMENDMENTS

2018—Subsec. (g). Pub. L. 115–270 added subsec. (g).
1978—Subsec. (d). Pub. L. 95–617, §207(a), substituted ''sixty'' for ''thirty'' in two places.
Subsec. (f). Pub. L. 95–617, §208, added subsec. (f).

**Statutory Notes and Related Subsidiaries**

STUDY OF ELECTRIC RATE INCREASES UNDER FEDERAL POWER ACT

Section 207(b) of Pub. L. 95–617 directed chairman of Federal Energy Regulatory Commission, in consultation with Secretary, to conduct a study of legal requirements and administrative procedures involved in consideration and resolution of proposed wholesale electric rate increases under Federal Power Act, section 791a et seq. of this title, for purposes of providing for expeditious handling of hearings consistent with due process, preventing imposition of successive rate increases before they have been determined by Commission to be just and reasonable and otherwise lawful, and improving procedures designed to prohibit anticompetitive or unreasonable differences in wholesale and retail rates, or both, and that chairman report to Congress within nine months from Nov. 9, 1978, on results of study, on administrative actions taken as a result of this study, and on any recommendations for changes in existing law that will aid purposes of this section.

### §824e. Power of Commission to fix rates and charges; determination of cost of production or transmission

**(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues**

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

**(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest**

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: *Provided*, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined**

Notwithstanding subsection (b), in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: *Provided*, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric

A4

ices. The amounts collected under this section shall be deposited in the Treasury to the credit of miscellaneous receipts. All printing for the Federal Power Commission making use of engraving, lithography, and photolithography, together with the plates for the same, shall be contracted for and performed under the direction of the Commission, under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe, and all other printing for the Commission shall be done by the Director of the Government Publishing Office under such limitations and conditions as the Joint Committee on Printing may from time to time prescribe. The entire work may be done at, or ordered through, the Government Publishing Office whenever, in the judgment of the Joint Committee on Printing, the same would be to the interest of the Government: *Provided*, That when the exigencies of the public service so require, the Joint Committee on Printing may authorize the Commission to make immediate contracts for engraving, lithographing, and photolithographing, without advertisement for proposals: *Provided further*, That nothing contained in this chapter or any other Act shall prevent the Federal Power Commission from placing orders with other departments or establishments for engraving, lithographing, and photolithographing, in accordance with the provisions of sections 1535 and 1536 of title 31, providing for interdepartmental work.

(June 10, 1920, ch. 285, pt. III, §312, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 859; amended Pub. L. 113–235, div. H, title I, §1301(b), (d), Dec. 16, 2014, 128 Stat. 2537.)

### Editorial Notes

#### CODIFICATION

''Sections 1535 and 1536 of title 31'' substituted in text for ''sections 601 and 602 of the Act of June 30, 1932 (47 Stat. 417 [31 U.S.C. 686, 686b])'' on authority of Pub. L. 97–258, §4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

### Statutory Notes and Related Subsidiaries

#### CHANGE OF NAME

''Director of the Government Publishing Office'' substituted for ''Public Printer'' in text on authority of section 1301(d) of Pub. L. 113–235, set out as a note under section 301 of Title 44, Public Printing and Documents.

''Government Publishing Office'' substituted for ''Government Printing Office'' in text on authority of section 1301(b) of Pub. L. 113–235, set out as a note preceding section 301 of Title 44, Public Printing and Documents.

## § 825*l*. Review of orders

### (a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

### (b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States

upon certiorari or certification as provided in section 1254 of title 28.

**(c) Stay of Commission's order**

The filing of an application for rehearing under subsection (a) shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

(June 10, 1920, ch. 285, pt. III, §313, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 860; amended June 25, 1948, ch. 646, §32(a), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Pub. L. 85–791, §16, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title XII, §1284(c), Aug. 8, 2005, 119 Stat. 980.)

#### Editorial Notes

##### Codification

In subsec. (b), "section 1254 of title 28" substituted for "sections 239 and 240 of the Judicial Code, as amended (U.S.C., title 28, secs. 346 and 347)" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

##### Amendments

2005—Subsec. (a). Pub. L. 109–58 inserted "electric utility," after "Any person," and "to which such person," and substituted "brought by any entity unless such entity" for "brought by any person unless such person".

1958—Subsec. (a). Pub. L. 85–791, §16(a), inserted sentence to provide that Commission may modify or set aside findings or orders until record has been filed in court of appeals.

Subsec. (b). Pub. L. 85–791, §16(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and in third sentence, substituted "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

#### Statutory Notes and Related Subsidiaries

##### Change of Name

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals".

### §825m. Enforcement provisions

**(a) Enjoining and restraining violations**

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper District Court of the United States or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available

concerning such acts or practices to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings under this chapter.

**(b) Writs of mandamus**

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

**(c) Employment of attorneys**

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interests in investigations made by it or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

**(d) Prohibitions on violators**

In any proceedings under subsection (a), the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as the court determines, any individual who is engaged or has engaged in practices constituting a violation of section 824u of this title (and related rules and regulations) from—

(1) acting as an officer or director of an electric utility; or

(2) engaging in the business of purchasing or selling—

(A) electric energy; or

(B) transmission services subject to the jurisdiction of the Commission.

(June 10, 1920, ch. 285, pt. III, §314, as added Aug. 26, 1935, ch. 687, title II, §213, 49 Stat. 861; amended June 25, 1936, ch. 804, 49 Stat. 1921; June 25, 1948, ch. 646, §32(b), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Pub. L. 109–58, title XII, §1288, Aug. 8, 2005, 119 Stat. 982.)

#### Editorial Notes

##### Codification

As originally enacted subsecs. (a) and (b) contained references to the Supreme Court of the District of Columbia. Act June 25, 1936, substituted "the district court of the United States for the District of Columbia" for "the Supreme Court of the District of Columbia", and act June 25, 1948, as amended by act May 24, 1949, substituted "United States District Court for the District of Columbia" for "district court of the United States for the District of Columbia". However, the words "United States District Court for the District of Columbia" have been deleted entirely as superfluous in view of section 132(a) of Title 28, Judiciary and Judicial Procedure, which states that "There shall be in each judicial district a district court which shall be a court of record known as the United States District Court for the district", and section 88 of Title 28 which states that "the District of Columbia constitutes one judicial district".

##### Amendments

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).